**IN THE COURT OF APPEALS OF IOWA**

No. 18-1106
Filed September 12, 2018

**IN THE INTEREST OF A.W.,**
**Minor Child,**

**J.M., Father,**
        Appellant,

**K.W., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Polk County, Joseph W. Seidlin, District Associate Judge.

A mother and father separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Steven L. Cooper of Cooper, Goedicke, Reimer & Reese, PC, West Des Moines, for appellant father.

Karmen R. Anderson of Anderson & Taylor, PLLC, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant Attorney General, for appellee State.

Yvonne C. Naanep, Des Moines, guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

A mother and father separately appeal the termination of their parental rights to A.W., born in March 2017. The father argues: (1) the State failed to present clear and convincing evidence of the grounds for termination, (2) termination is not in the child's best interest, (3) statutory exceptions to termination apply, and (4) additional time for reunification should be granted. The mother only challenges the court's denial of a six-month extension.

## I.    Background Facts and Proceedings

A.W. came to the attention of the Iowa Department of Human Services (DHS) in late June 2017 upon information that the mother was using heroin while caring for A.W. On June 21, A.W. was removed from the mother's care and placed with the father.[1] The mother admitted herself to the hospital that same day, seeking to detox. During her hospitalization, the mother was diagnosed with several mental disorders and continued inpatient hospitalization was recommended. However, on the next day, June 22, the mother became violent and attacked staff, which resulted in her arrest and transfer to jail. After the mother posted bail, she did not return to the hospital or follow through with the recommended inpatient hospitalization.

The child was subsequently removed from the father's custody after he tested positive for methamphetamine. The child was initially placed with a paternal aunt. The court later modified placement to a foster home because the aunt no longer wanted to care for the child.

---

[1] The father only learned of his paternity a few weeks prior to assuming care of A.W.

In July, DHS returned a founded child-abuse assessment against both parents for denial of critical care—failure to provide adequate supervision. During the investigation, the mother admitted to using both heroin and methamphetamine while caring for A.W and the father admitted he observed and made a video of the mother using heroin while A.W. was in the home.

In August, A.W. was adjudicated a child in need of assistance with a primary permanency goal to return to the mother's care. The court ordered the parents to engage in substance-abuse and mental-health evaluations and treatment and provide random drug screens. The court also ordered both parents to engage in domestic violence services due to reported aggressive incidents between the two parents, both before and after A.W.'s birth, and the father's acknowledged history of domestic violence. Further, the mother was required to continue treatment with her psychiatrist and follow all medication recommendations.

Before coming to the attention of DHS, the mother had a significant history of childhood trauma and suffered from multiple mental-health issues. As a result, she takes medication and attends therapy. The mother is currently pregnant with twins,[2] which resulted in a decrease of some of her medications. Her doctor terminated their doctor-patient relationship due to the mother's failure to comply with recommended prenatal care or appear for prenatal visits.

From October 2017 to February 2018, the mother participated in child-parent psychotherapy (CPP) with A.W. However, the sessions ended due to the mental-health issues which negatively affected A.W. during their sessions. The

---

[2] A.W.'s father is believed to be the father of the twins. The mother and father were not in a romantic relationship at the time of the termination hearing.

father declined to engage in any mental-health services during the pendency of this case except for attempting to set up CPP sessions between A.W. and himself two weeks prior to the termination hearing. He also had a mental-health evaluation scheduled after the hearing date.

The mother did not complete substance-abuse treatment by the time of the termination hearing. She participated in services but continued to use illegal substances. She admitted she used heroin in February and March 2018. On April 21, the police arrested the mother for possession of methamphetamine after they found methamphetamine and paraphernalia in her purse. The mother also admitted to police she used methamphetamine the previous day. The father attempted outpatient substance-abuse treatment three times over the course of the case, with the most recent attempt beginning two weeks prior to the termination hearing. In his first two attempts, he was unsuccessful and ended his participation after only a few weeks. The father's drug tests during the proceedings were all positive for methamphetamine.

The permanency goal remained reunification until March 5, when the State filed a petition to terminate parental rights based on the lack of progress of both parents in addressing their mental-health and substance-abuse issues. The court ultimately terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(h) (2018) and the mother's parental rights pursuant to section 232.116(1)(h) and (*l*). The mother and father separately appeal.

## II. Standard of Review

"We review proceedings terminating parental rights de novo." *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "We are not bound by the juvenile court's

findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.*

**III.    Analysis**

"Termination of parental rights under chapter 232 follows a three-step analysis." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "First, the court must determine if a ground for termination under section 232.116(1) has been established." *Id.* "If a ground for termination is established, the court must, secondly, apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights." *Id.* at 706–07. "Third, if the statutory best-interest framework supports termination of parental rights, the court must consider if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights." *Id.* at 707.

The mother does not argue the State did not meet its burden for termination under section 232.116(1)(h) and (*l*), termination is contrary to the best interests of A.W., or a statutory exception to termination should be applied. As such, we need only consider her challenge to the denial of an extension of time to work toward reunification. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

A.    Statutory Grounds for Termination

The juvenile court terminated the father's parental rights pursuant to section 232.116(1)(h), which provides termination may be ordered where there is clear and convincing evidence the child: (1) is three years of age or younger, (2) has been adjudicated a child in need of assistance, (3) has been removed from the physical custody of the parents for at least six of the last twelve months, or for the last six

consecutive months and any trial period at home has been less than thirty days, and (4) the child cannot be returned to the parent's custody at the present time.

The father does not challenge the establishment of the first three elements. He only challenges the fourth element, contending he was in a position to resume care and custody of A.W. at the time of the termination hearing. *See D.W.*, 791 N.W.2d at 707 (interpreting term "at the present time" to mean "at the time of the termination hearing"). He argues DHS had no concerns about his parenting during the pendency of the case and he has demonstrated periods of sobriety. He further highlights that he reengaged in substance-abuse treatment and any substance-abuse issues he may have does not prevent A.W.'s return to his custody.

Despite the father's contentions that he was able to resume care and custody of A.W. at the time of the hearing, a review of the record provides abundant evidence of the contrary. The child was removed from the father's care due to his substance abuse, and that issue remains unaddressed. The father recognizes that he is a "functional addict," but has yet to take any meaningful steps to address his addiction. Although the father completed several substance-abuse evaluations, he failed to follow through on the recommendations for treatment. The father started treatment on several occasions but ceased attendance after a short time. He has tested positive for methamphetamine multiple times over the pendency of this case. He admitted he relapsed five times since the case began and used marijuana and methamphetamine approximately two weeks prior to the termination hearing. Further, in addition to substance-abuse services, mental-health services were recommended for the father, but the father failed to follow through with these recommendations. He completed a mental-health evaluation

in November 2017, but he declined any services other than to contact a therapist to set up CPP sessions two weeks prior to the termination hearing. Finally, though the father's interactions with A.W. were positive, they never progressed beyond fully supervised visits.

"Time is a critical element. A parent cannot wait until the eve of termination . . . to begin to express an interest in parenting." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000). We agree with the juvenile court that the State proved by clear and convincing evidence the child could not returned to the father's care at the time of the termination hearing and find sufficient evidence to support the ground for termination under subsection (h).

B.      Best Interests and Exception to Termination

The father next claims termination of his parental rights is not in A.W.'s best interests, arguing that he loves the child and has never done anything to harm A.W. He also contends he is the best long-term option for A.W.'s growth and development.

"As a general rule, when the statutory grounds for termination of parental rights have been proved, the termination of parental rights is in the best interests of the children." *In re C.M.*, No. 14-1140, 2015 WL 408187, at *3 (Iowa Ct. App. Jan. 28, 2015). "When we consider whether parental rights should be terminated, we 'shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.'" *In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016) (quoting Iowa Code § 232.116(2)). The court can also consider if the "child has become integrated into the foster family" and "whether

the foster family is able and willing to permanently integrate the child into the foster family."  Iowa Code § 232.116(2)(b).

At the time of the termination hearing, A.W. was one year old and had been removed from the father's care for approximately ten months.  A.W. had been in the father's care for less than three weeks before removal due to his methamphetamine use.  Despite the offer of services to address his substance-abuse and mental-health issues, the father has failed to participate in any meaningful way.  Though the father's visits with the child were mostly positive, he has not progressed to an increased number of visits or a lower level of supervision and they remained fully supervised.  A.W. has remained in the same foster family since August 2017 and has bonded with them; the foster parents seek to adopt A.W.  We find termination is in A.W.'s best interests.

The father further argues that an exception to termination applies because of the bond between him and the child.  Termination may be precluded when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."  *Id.* § 232.116(3)(c).  "'The factors weighing against termination in section 232.116(3) are permissive, not mandatory,' and the court may use its discretion, 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'"  *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (quoting *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011)).  "Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is

capable of providing.'"  *C.B.*, 611 N.W.2d at 495 (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981)).

On our de novo review, we do not find clear and convincing evidence that termination would be detrimental to A.W.  Though the father loves A.W., "our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the father's] inability to provide for [A.W.]'s developing needs." *D.W.*, 791 N.W.2d at 709.  A.W. was only in the father's care for a few weeks when she was only a few months old, and after removal, he did not progress beyond fully supervised visits.  The father continued to use methamphetamine and marijuana after A.W.'s removal and declined to participate in recommended services.  Whatever bond there is between A.W. and the father, "the [father]-child bond should not override termination where, as here, the [father] is unable to meet the child's needs for a consistent permanent home with a responsible parent, and the child is adoptable." *In re J.P.*, No. 14-0673, 2014 WL 3513237, at *6 (Iowa Ct. App. July 16, 2014).

Further, A.W. has remained in the consistent and stable care of the same foster family since August 2017, who have expressed the desire to adopt A.W.  The father alternatively requests the court place A.W. in a guardianship instead of terminating his rights. However, no witnesses at trial mentioned the idea of guardianship and both the family safety, risk, and permanency (FSRP) care coordinator and DHS worker recommended termination.  Upon our review, we find the father failed to meet his burden to establish a statutory exception to termination or establish guardianship as a meaningful option to preclude termination of his parental rights.

C.     Extension

Finally, both parents request an additional six months to work toward reunification.   The mother contends she has attended mental-health and substance-abuse treatment throughout the entire case and participated in both visits and therapy with A.W.  She argues that with her recent acceptance into an inpatient program, reunification is possible within six months.  She further argues that she suffers from severe mental-health and substance-abuse issues which take longer to address and with the added stress of her pregnancy, she needs more time to resolve those issues.  The father argues he has demonstrated stability in many areas of his life, including housing, transportation, and employment and with his participation in substance-abuse treatment, he would be able to resume custody within six months.

Section 232.104(2)(b) allows the juvenile court the option to continue placement of a child for an additional six months to work towards reunification if the court finds "the need for removal . . . will no longer exist at the end of the additional six-month period."  Despite the mother's contention that she attended the recommended services throughout the case, the record reflects that she failed to engage in those services in any meaningful way and was not receptive to feedback about her lack of engagement.  Further, A.W. was removed from the mother's care due to her heroin use while caring for the child.  After removal, she refused on numerous occasions to drug test in a timely manner.  The mother relapsed at the end of February, admitted to using heroin and methamphetamine only two weeks prior to the termination hearing, and was arrested for possession of methamphetamine on April 21.  The mother was unemployed for the majority of

the pendency of the case, and DHS has not observed her residence to verify its suitability since late 2017. The mother's visits remained fully supervised, and the record reflects there were issues with her behavior and self-care during many visits and her sobriety at recent interactions. Additionally, the effect the mother's visits had on A.W. is concerning. The FSRP worker noted A.W. became limp like a rag doll or had a flat affect during several visits. A.W. also exhibited an unwillingness to engage with the mother and often looked to the worker rather than the mother for care. The CPP therapist reported the mother struggled to understand how her disorganized and distressed responses negatively affected A.W, failing to recognize A.W.'s reactions to her mood and behavior during their joint sessions. The sessions ended due to the mother's need to address her mental health. In sum, the issues that led to A.W.'s removal from the mother's care remain, and the record does not support the mother's claim that she will be able to address those issues and be in a position to safely parent A.W. within six months.

Much like the mother, the record also reflects the father would not be able to resume custody of A.W. within six months. The father has failed to address his substance-abuse issues, the impetus for A.W.'s removal from his care. He admitted relapsing multiple times during the pendency of the case and used both marijuana and methamphetamine only a few weeks prior to the termination hearing. He failed to participate in recommended services and if he did participate, it was only minimally or for a short period of time. Though the father completed a substance-abuse evaluation in the month prior to the termination hearing and planned to enter an inpatient treatment facility after the termination hearing, he still has not addressed his mental-health and domestic-violence issues.

The circumstances and issues that existed at the time of A.W.'s removal from both the mother's and father's care remain, and there is no evidence any additional time would correct the issues. Children "should not be forced to endlessly await the maturity of a natural parent." *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997). We echo the juvenile court and "implore both parents to fully engage in and complete the treatment they each told the court they now recognize they need. There are two more children on the way . . . [and] the court would wish nothing more than to see [the] parents put themselves in a position to raise them." However, A.W. is in need of permanency and stability now and should not have to wait any longer while the parents attempt sobriety and face their problems. We find an extension is unwarranted for either parent and therefore affirm the order terminating their parental rights.

## IV. Conclusion

On our de novo review we find by clear and convincing evidence the grounds for terminating the father's rights, termination is in A.W.'s best interests, and no statutory exceptions to termination apply. We decline to grant either parent an extension and affirm the decision of the juvenile court to terminate the father's and mother's parental rights.

**AFFIRMED ON BOTH APPEALS.**